IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:09mj112 |
| | ) | |
| DUSTIN MILAN | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, Spencer Brooks, being duly sworn, depose and say:

1. I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI") and have been so employed since November 2006. I am assigned to the FBI's Washington Field Office and work on a squad that investigates bank fraud and mortgage fraud.

2. This affidavit is in support of an application for a complaint and arrest warrant in violation of Title 18 United States Code, Section 1344 (Bank Fraud).

3. The facts and information contained in this affidavit are based upon my personal knowledge, as well as observations of other United States Government officials involved in this investigation. All observations that were not personally made by me were related to me by the persons who made them or by representatives of those persons. This affidavit does not contain each and every fact known to the government, but only those necessary to support a finding of probable cause.

1

## I. BACKGROUND: FBI RAID ON PCM AND THE $5.5 MILLION BANK FRAUD SCHEME

4. On June 25, 2008, the FBI conducted a search warrant at Preferred Choice Mortgage ("PCM"), located at 10220 River Road, Suite 202, Potomac, Maryland. The search resulted from information relayed to the FBI by an informant who was involved in what was a $5.5 million bank fraud scheme. The ringleader, MICHAEL MILAN ("MILAN"), working with others, arranged for numerous fraudulent home equity loans to be taken out on a property that in fact held no equity. MILAN and his coconspirators submitted numerous loan applications comprising fraudulent HUD-1's, income statements and tax returns. The banks, all of which were federally insured, were unaware of the other loan applications.

5. The scheme's objective was to close on the loans simultaneously and escape with the proceeds once they had been wired into accounts controlled by the conspirators. Due to the FBI's execution of the search warrant, the scheme was thwarted and the banks were notified prior to their wiring any loan proceeds.

6. In addition to evidence seized in connection with the $5.5 million bank fraud scheme described, the FBI seized numerous other documents and files at PCM that appeared to be evidence of similar schemes. One of the coconspirators who has pleaded guilty in this matter has stated that "every" loan processed by PCM was fraudulent.

## II. GUILTY PLEAS OF COCONSPIRATORS

7. As a result of the raid on PCM, numerous targets, including attorneys and accountants, have been identified. Three guilty pleas have been entered in connection with the above described scheme, two before the Honorable Gerald Bruce Lee and one before the Honorable Leonie

M. Brinkema.

### III.   DUSTIN MILAN

8. DUSTIN MILAN ("DUSTIN") is MILAN's son and worked alongside his father at PCM. During the execution of the search warrant on PCM, DUSTIN was interviewed by FBI agents. He made the following false and misleading statements, among others, to the interviewing agents:

   a. The only company MICHAEL MILAN and DUSTIN operate out of 10220 River Road, Suite 202, Potomac, Maryland, was a company called COOLLID CORPORATION.

   b. DUSTIN's father previously worked for an unidentified woman at PCM, but lost his job a few months ago. DUSTIN was not sure why his father stopped working at PCM.

9. In fact, my investigation has revealed that DUSTIN and his father were operating numerous businesses out of the office at 10220 River Road, Suite 202, including PCM, INFINITY FINANCIAL ("INFINITY"), PHANTOM FINANCIAL ("PHANTOM"), and COOLLID CORPORATION ("COOLLID"), all of which were being used to perpetrate similar fraudulent schemes. Further, MILAN never ceased working for PCM, which he was using to close the numerous fraudulent loans relating to the $5.5 million bank fraud scheme on the day of the FBI raid.

10. DUSTIN was a joint, authorized signer on numerous bank accounts (along with MILAN), including, among others, accounts in the names of INFINITY, PHANTOM, and COOLLID at Commerce Bank.

## IV. DUSTIN AND MICHAEL MILAN'S FLIGHT TO IRAN TO EVADE U.S. AUTHORITIES

11. Days after the FBI raid on PCM, while prosecutors from the U.S. Attorney's office were in discussions with MILAN's attorney, DUSTIN and MILAN fled the United States to Iran. Prior to fleeing the United States, MILAN surrendered both his United States and Iranian passports to the U.S. government. According to MILAN's attorney, those were the only passports that MILAN had. During discussions, MILAN's attorney was informed of the pending charges and that the relevant loss amount was well above $2.5 million dollars.

12. My investigation has revealed that in early July 2008, DUSTIN and MILAN met with a former girlfriend of MILAN's and told her that they were in trouble with the FBI. They convinced her to accompany them across the Canadian border, where MILAN used a fraudulent passport and, with DUSTIN, boarded a flight to Iran. At the border crossing into Canada, DUSTIN collected the fraudulent passport from MILAN and presented it, along with his own passport, to the Canadian border agent.

13. On July 17, 2008, an arrest warrant was obtained in the Eastern District of Virginia for MILAN related to the $5.5 million bank fraud scheme. MILAN was not arrested because he had already fled the United States.

## V. DUSTIN AND MILAN'S "CREDIT COUNSELING" SCHEME

14. MILAN's primary loan processor at PCM, MELANIE EKSTROM, who has pleaded guilty in this matter, told the FBI that "every" loan she processed for MILAN at PCM was fraudulent. In addition, INFINITY and PHANTOM, both of which were controlled exclusively by DUSTIN and MILAN, were used to extract substantial "fees" from clients.

Specifically, clients were instructed to sign an "Assignment of Funds" which would turn over a significant portion of the fraudulently obtained loan proceeds to MICHAEL MILAN under the guise of a "credit counseling" fee.

15. EKSTROM informed the FBI that the "credit counseling" was part of the scheme to defraud because DUSTIN and MILAN would purport to pay off the debts of clients with checks from bank accounts that were closed or had no money in them. DUSTIN and MILAN would then pull the client's fraudulently bolstered credit score prior to the creditor discovering that the payment was fraudulent. According to EKSTROM, DUSTIN and MILAN's "credit counseling" scheme began in 2005, when she worked with both of them at CONGRESSIONAL FUNDING in Rockville, Maryland.

## VI. DUSTIN'S AUGUST 2008 BANK FRAUD INVOLVING INFINITY FINANCIAL

16. In December 2006, MILAN obtained a credit line for $30,000 for INFINITY from Suntrust Bank in Maryland, which is federally insured. On the credit line application, MILAN fraudulently stated that INFINITY had been operating since 2001 and annual sales for the company totaled $1.2 million. In addition, MILAN falsely answered "No" to the question, "Has the applicant ever declared bankruptcy or had any judgments, repossessions, garnishments, or other legal proceedings filed against them?" MILAN did not disclose that in 2003, he was arrested, convicted, and incarcerated for 10 months in a federal prison in for his role in another fraudulent scheme.

17. The INFINITY credit line was due and owing for approximately $30,000 in or around August 2008. In October 2008, the FBI was contacted by Suntrust Bank regarding a "bust out" scheme on the INFINITY credit line. A Suntrust Bank Investigator provided documents

to me, which showed that a fraudulent payment of $29,500 was made on the $30,000 credit line. The fraudulent payment was a check drawn on a Commerce Bank account in the name of COOLLID, a company owned and operated by DUSTIN and MILAN.

18. Before the payment was identified as fraudulent by Suntrust Bank, the INFINITY credit line was replenished, and another $30,000 became available in credit. On August 14, 2008, the account was drawn down by $29,000. The $29,000 in fraudulent proceeds was wired to an account in the name of HAREL C.

19. On August 15, 2008, HAREL C. wired $30,800 from her federally insured Suntrust bank account at the branch office in McClean, Virginia, to an account at Bank of America in the name of HOSSEIN S. According to the writing on a Suntrust Bank General Ledger Debit slip, the $29,000 was transferred to HAREL C.'s account "per Michael Milan see central file for fax request."

20. According to bank statements provided by a Commerce Bank (now TD Bank) Investigator, the COOLLID bank account (which had been used to make a fraudulent payment on the INFINITY credit line) only had a balance of $6.52 on the day that the fraudulent $29,500 check was written: August 11, 2008.

21. In addition, two other checks drawn on the COOLLID Commerce Bank account were returned as fraudulent during the same time frame as the $29,500 check. In particular, on August 6, 2008, a $4,800 COOLLID check was returned to Commerce Bank by Suntrust Bank, and on August 13, 2008, one day before the $29,500 check was deposited, a $9,213.66 COOLLID check was returned to Commerce Bank by Suntrust Bank.

22. On January 12, 2009, HAREL C. was interviewed by FBI agents. HAREL C. told the agents

the following:

    a. In mid-July 2008, HAREL C. received a phone call on her cell phone from DUSTIN. MILAN told HAREL C. he was overseas on business and needed HAREL C.'s help in sending a wire transfer to one of DUSTIN's business partners. DUSTIN did not tell HAREL C. what country he was in, but HAREL C. recognized the prefix, 917, as a telephone number from the United Arab Emirates.

    b. DUSTIN told HAREL C. "you are the only one I trust" to send the wire transfer. He also told HAREL C. she needed to have a Suntrust Bank account to be able to send the wire transfer. HAREL C. did not have a Suntrust account so DUSTIN instructed her to open one. DUSTIN further told HAREL C. not to tell anyone about the bank account, especially her husband.

    c. The day after receiving the telephone call from DUSTIN, HAREL C. opened an account at Suntrust Bank's McLean, Virginia branch office. HAREL C. sent a text message to DUSTIN to let him know she had opened the account.

    d. A few weeks later, HAREL C. received a text message from DUSTIN that asked HAREL C. to wire $30,000 to a business partner of DUSTIN's at a Bank of America account. DUSTIN told HAREL C. that he had already transferred the money to her account. DUSTIN provided the Bank of America account number to HAREL C. HAREL C. then went to Suntrust's McLean, Virginia branch and sent the $30,000 wire transfer as instructed.

    e. HAREL C. later spoke with DUSTIN about the $30,000 wire transfer.

       During the conversation, HAREL C. confirmed DUSTIN was overseas with MILAN (his father), because HAREL C., who knew MILAN, could hear MILAN's voice in the background giving instructions to DUSTIN.

23. Due to the aforementioned "bust out" scheme, Suntrust Bank incurred a loss of $58,922 on the INFINITY credit line. As stated, prior to the fraudulent payment of $29,500, the balance owed on the $30,000 credit line was approximately $30,000. Due to the fraudulent payment, which made funds available again for withdrawal, Suntrust Bank incurred an additional loss. Due to the fraudulent payment, MICHAEL MILAN and DUSTIN were able to borrow, and in turn steal, twice the credit which was available on their fraudulently established credit line.

## VII. DUSTIN's RETURN TO THE UNITED STATES

24. On January 9, 2009, DUSTIN returned to the United States on a flight into Dulles International Airport. My investigation revealed that DUSTIN entered the United States after having MILAN confirm through a bail bondsman that there was no outstanding arrest warrant for DUSTIN. MILAN currently remains overseas in the middle east and appears to be funding his lifestyle with the proceeds of his numerous frauds.

25. Based on the paragraphs above, I believe there is probable cause to believe DUSTIN has committed, among other offenses, bank fraud (Title 18, United States Code, Section 1344), and that probable cause exists for his arrest. As such, I respectfully request that a complaint and arrest be issued for DUSTIN.

_____
Spencer Brooks
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed in my presence:
/s/Thomas Rawles Jones, Jr.
_____
United States Magistrate Judge

February 9, 2009

9